# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SPRINT NEXTEL CORPORATION AND )
SUBSIDIARIES and EMBARQ CORPORATION, )
                     )
           **Plaintiffs,** )    **CIVIL ACTION**
                     )
**v.** )    **No. 09-2325-KHV/JPO**
                     )
UNITED STATES OF AMERICA, )
                     )
           **Defendant.** )
_____)

## MEMORANDUM AND ORDER

Plaintiffs bring suit against the United States seeking a refund of federal income taxes paid for the taxable years that ended December 31,1990 through 1994, and certain tax credits from the taxable year that ended December 31, 1988. Plaintiffs argue that they are entitled to the refund and tax credits because they incorrectly treated payments from the Federal Communications Commission ("FCC") Universal Service Fund ("USF") as taxable gross income instead of nontaxable nonshareholder contributions to capital.[1] The government disagrees. It argues that such payments are not contributions to capital, but are taxable as gross income.[2] The parties have stipulated to all material facts; they thus present a purely legal question: whether the USF high-cost support payments which plaintiffs received during the taxable years in question constitute nonshareholder contributions to capital. This matter comes before the Court on the parties' cross-motions for summary judgment – <u>Plaintiffs' Motion For</u>

---

[1] Plaintiffs also request oral argument on the parties' motions. The Court overrules plaintiffs' request pursuant to D. Kan. Rule 7.2, which provides that the "court ordinarily will resolve motions on the parties' written briefs or memoranda."

[2] The government also contends, alternatively, that even if the payments are nontaxable nonshareholder contributions to capital, plaintiffs' attempt to amend its tax returns constitutes an unauthorized and improper change in its method of accounting under I.R.C. § 446.

Summary Judgment (Doc. #38) filed December 7, 2010 and United States' Motion For Summary Judgment (Doc. #40) filed December 7, 2010. For the reasons set forth below, the Court sustains the government's motion and overrules plaintiffs' motion.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). The parties agree that there are no genuine issues of material fact, but disagree over which party is entitled to judgment as a matter of law.

In a tax refund suit, the taxpayer has the burden of showing that the disputed tax assessment was erroneous as well as the amount that it is entitled to recover. See United States v. Janis, 428 U.S. 433, 440 (1976); Dye v. United States, 121 F.3d 1399, 1408 (10th Cir. 1997). Plaintiffs "bear[] the burdens both of production and of persuasion" on these elements of its case. Dye, 121 F.3d at 1408.

## Statutory And Regulatory Background

The parties' only dispute is whether the high-cost support payments plaintiffs received from the USF constitute taxable gross income or nontaxable nonshareholder contributions to capital. I.R.C. Section 61 defines "gross income" broadly as "all income from whatever source derived." I.R.C. § 61(a). Gross income, minus allowable deductions, equals taxable income. See I.R.C. § 63(a). The Supreme Court has repeatedly stated that the "sweeping scope" of Section 61 reflects Congress's intent to "exert . . . the full measure of its taxing power." Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955). It has also emphasized the corollary to this principle – that courts must narrowly construe

exclusions from income. Comm'r v. Schleier, 515 U.S. 323, 328 (1995); see Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 715 (2011).

The tax provision at the center of this litigation, Section 118(a), creates such an exclusion; it provides as follows: "In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." I.R.C. § 118(a). "Contribution to capital" is not expressly defined by statute or regulation, but Treasury Regulation Section 1.118-1 provides the following guidance:

> Section 118 . . . applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities.

Treas. Reg. § 1.118-1. In addition, a number of federal circuit courts of appeal have concluded that the legislative history of Section 118 makes it clear that Congress intended to incorporate existing (i.e., pre-1954) court decisions that defined contributions to capital, and the parties agree. See AT&T, Inc. v. United States, No. 09-50651, 2011 WL 9729, at *6 (5th Cir. Jan. 4, 2011); Nathel v. Comm'r, 615 F.3d 83, 89 (2d Cir. 2010); Federated Dep't Stores, Inc. v. Comm'r, 426 F.2d 417, 421 (6th Cir. 1970); United Grocers, Ltd. v. United States, 308 F.2d 634, 637-38 (9th Cir. 1962); see also H.R. Rep. No. 83-1337 § VII(H) (1954), reprinted in 1954 U.S.C.C.A.N. 4017, 4042 (Section 118 "in effect places in the code the court decisions on this subject"); S. Rep. No. 83-1622 (1954) § I(1), reprinted in 1954 U.S.C.C.A.N. 4621, 4648 (same). Neither the Treasury Regulation, which essentially summarizes the Supreme Court case law, nor the Court's decisions, provide a particularly clear definition of "contributions to capital."

-3-

## Pre-1954 Supreme Court Decisions

### Edwards v. Cuba Railroad Co.

In Edwards v. Cuba Railroad Co., the Supreme Court held that payments from the Cuban government for the construction and operation of railroad lines in Cuba were contributions to capital. 268 U.S. 628 (1925).[3] It noted that "[t]he subsidy payments were proportionate to mileage completed," which "indicate[d] a purpose to reimburse plaintiff for capital expenditures." Id. at 632. It then observed that the payments were (1) not "to be used for the payment of dividends, interest or anything else properly chargeable or payable out of earnings income," (2) not "made for services rendered or to be rendered" and (3) not "profits or gains from the use or operation of the railroad." Id. at 633.

### Texas & Pacific Railway Co. v. United States

Texas & Pacific Railway dealt with post-World War I federal government payments designed to help railroads transition from federal control to profitable private enterprise. The Court concluded that such payments were not contributions to capital. 286 U.S. 285 (1932). Section 209 of the Transportation Act of 1920 guaranteed certain railroads a minimum operating income for six months after the end of the war. Id. at 288. The "purpose of the guaranty provision was to stabilize the credit position of the roads by assuring them a minimum operating income." Id. at 289. If a railroad's operating income exceeded the guaranteed amount, it was required to pay the excess back to the government. Id. at 288.

The Court reasoned as follows:

---

[3]　　In Cuba Railroad Co., the Supreme Court ultimately held that the Cuban government subsidies were not taxable income under the Sixteenth Amendment. This holding, however, has been eroded by subsequent Supreme Court decisions, including Detroit Edison and Brown Shoe, "which gradually but persistently broadened the concept of taxable income." Hayutin v. Comm'r, 508 F.2d 462, 479-80 (10th Cir. 1974).

> If the fruits of the employment of a road's capital and labor should fall below a fixed minimum, then the government agreed to make up the deficiency, and, if the income were to exceed that minimum, the carrier bound itself to pay the excess into the federal treasury. In the latter event, the carrier unquestionably would have been obligated to pay income tax measured by actual earnings; in the former, it ought not to be in a better position than if it has earned the specified minimum. Clearly, then, the amount paid to bring the yield from operation up to the required minimum was as much income from operation as were the railroad's receipts from fares and charges.

Id. at 289. It further noted that the payments "were not subsidies or gifts . . . conditioned upon construction work performed." Id. Rather, they were "measured by a deficiency in operating income, and might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied." Id. at 290.

### Detroit Edison Co. v. Commissioner of Internal Revenue

Detroit Edison Co. v. Commissioner of Internal Revenue involved whether payments from power company customers to cover the costs of providing them service were contributions to capital. 319 U.S. 98. Detroit Edison, a power company, received many applications for service that "would require an investment in extension of its facilities greater than prospective revenues therefrom would warrant." Id. at 99. In such a circumstance, it would enter into a contract with the customer pursuant to which the customer would pay for the estimated cost of extending the company's facilities. Id. at 99-100. Detroit Edison placed the customer payments into its general account and did not earmark the payments for use on particular projects. Id. at 100. The Court concluded that

> it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a sembalance [sic]. The payments were to the customer the price of the service. The receipts have gone, so far as here involved, to add to the Company's surplus.

Id. at 102-03.

**Brown Shoe Co. v. Commissioner of Internal Revenue**

Brown Shoe Co. v. Commissioner of Internal Revenue, similar to Detroit Edison, involved payments intended to induce Brown Shoe to locate or expand manufacturing operations in certain communities. 339 U.S. 583 (1950). The cash and property contributions in Brown Shoe, however, came from community groups, not customers. See id. at 591. Brown Shoe received the payments pursuant to contracts that obligated it to locate or expand facilities in particular communities. Id. at 586.[4] It did not earmark the cash sums it received from the community groups for any particular project, but deposited them into its general bank account from which it paid general operating expenses, as well as the cost of all assets acquired in the towns involved. Id. at 587.

The Court concluded that the assets which Brown Shoe received from the community groups were "additions to 'capital' as that term has commonly been understood in business and accounting practice." Id. at 589. The Court reasoned as follows:

> Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company.

Id. at 591.

These four cases comprise the Supreme Court case law in effect when Congress enacted Section 118. The Court has spoken on this question only one other time, in United States v. Chicago, Burlington

---

[4] Eleven of the 12 community groups that provided the payments in question did so pursuant to a contract. The lone payment that was not based upon a contractual obligation involved a $10,000 payment for organization expenses required to open a factory in the particular town. Brown Shoe, 339 U.S. at 587.

& Quincy Railroad Co., 412 U.S. 401 (1973) ("CB&Q").

**United States v. Chicago, Burlington & Quincy Railroad Co. ("CB&Q")**

In CB&Q, the Supreme Court attempted to reconcile its prior cases, particularly Detroit Edison and Brown Shoe, and distill from them factors which courts should consider when determining whether to treat corporate receipts as taxable income or as nontaxable contributions to capital. CB&Q, 412 U.S. at 413. The Supreme Court emphasized that the intent of the transferor is the controlling factor. Id. at 411. It explained that in both Detroit Edison and Brown Shoe, the Court had "stressed the intent or motive of the transferor and determined the tax character of the transaction by that intent or motive." Id. The distinction between Detroit Edison and Brown Shoe therefore turned on "the nature of the benefit to the transferor, rather than to the transferee," and on "whether that benefit was direct or indirect, specific or general, certain or speculative," which are all "indicia of the transferor's intent or motive." Id.

The Supreme Court then drew from the two cases a non-exclusive list of five characteristics of a nonshareholder contribution to capital under the I.R.C.: (1) the receipt "must become a permanent part of the transferee's working capital structure;" (2) it "may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee;" (3) it "must be bargained for;" (4) it "must result in benefit to the transferee in an amount commensurate with its value;" and (5) it "ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect." Id. at 413.

Applying these factors in CB&Q, the Court concluded that the assets which CB&Q received from state governments, including highway undercrossings and overcrossings, crossing signals, signs and floodlights, jetties and bridges, were not contributions to capital. Id. at 414-15. Specifically, it

concluded that any incremental economic benefit to CB&Q from the facilities was marginal; they were peripheral to its business and did not materially contribute to railroad income production; CB&Q received the assets regardless of its need for capital funds; and the assets would not foreseeably assist CB&Q in producing future income. Id. It therefore held that the assets were not contributions to capital. Id. at 415.

## Universal Service Fund And High-Cost Support Program

In the Communications Act of 1934, Congress created the FCC and codified the so-called "universal service mandate," "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended in 47 U.S.C. § 151). Congress charged the FCC with promoting and advancing its goal of universal telecommunication service. See id.

In 1983, the FCC created the Universal Service Fund ("USF"), which included a high-cost support program designed to assist local carriers that provided service in high-cost areas of the country. In re Amendment Of Part 67 Of The Commission's Rules And Establishment Of A Joint Board, 96 F.C.C. 2d 781, ¶ 21 (adopted Dec. 1, 1983; released Feb. 15, 1984) ("1984 Order"). The program provides financial assistance to local carriers whose actual average cost of providing a telephone line to a customer's premises ("loop cost") in a particular geographic region ("study area") exceeds the national average loop cost by a benchmark percentage.

The 1984 Order provided this assistance by shifting local exchange plant costs from intrastate to interstate services. See 1984 Order ¶¶ 1-2. Because the same physical components of a telephone network are used to make both local and long-distance calls, the FCC uses "separations" rules to

determine what portion of the costs of the shared components should be recovered through local rates (under the intrastate regulatory jurisdiction of state public utility commissions) versus long-distance rates and related charges (under the interstate regulatory jurisdiction of the FCC). See 47 C.F.R. Part 36. In the 1984 Order, the FCC required that interstate rates and charges cover 25 per cent of shared, non-traffic-sensitive equipment, including loop equipment. 1984 Order ¶ 2. For geographic areas with above-average local loop costs, the Commission ordered that interstate charges cover an additional percentage of the costs associated with shared facilities. The actual percentage depended on the number of loops in the area and the amount by which the local carrier's average loop cost exceeded the national average.

For example, in 1990 through 1994, a telecommunications carrier that provided local services in a study area with 200,000 or fewer working loops was eligible for a high-cost support payment if its average cost per working loop exceeded 115 per cent of the national average cost per loop. See 47 C.F.R. § 36.631(c)(1) (1990). If the carrier qualified, and if its average cost per working loop was between 115 and 150 per cent of the national average, the high-cost interstate allocation would shift 65 per cent of the excess costs to interstate carriers. Id. § 36.631(c)(1)-(2). The share of loop costs assigned to interstate carriers is directly proportionate to the amount by which a local carrier's average loop costs exceed the national average – as local carrier costs increase beyond 115 per cent of the national average, interstate carriers' cost burden likewise increases. See id. The USF effectuates the cost-shift by issuing the local carrier a high-cost support payment equal to the amount of the additional expenses the interstate carrier is obligated to cover.

The National Exchange Carrier Association ("NECA") determines the national average cost per loop based on actual loop investment and cost data that the carriers submit to it. Specifically, NECA

considers (1) the cost of capital for financing investment in loop assets; (2) annual depreciation attributable to loop facilities; (3) maintenance expenses attributable to loop facilities; and (4) "corporate operations" expenses attributable to loop facilities.[5] 47 C.F.R. § 36.621(a)(1)-(4) (1990). It then divides the total study area loop cost by the carrier's number of "working loops" in the study area to determine the average loop cost per working loop. See 47 C.F.R. §§ 36.621(a)(1), 36.622(b) (1990).

The FCC intended the high-cost support program to "moderate local exchange rates in high cost areas." 1984 Order ¶ 21; see also id. ¶ 30 (high-cost support program "will promote universal service by enabling telephone companies and state regulators to establish local exchange service rates in high cost areas that do not greatly exceed nationwide average levels"). The FCC acknowledged "that directing assistance to high cost areas will not directly solve the problems of the poor and those living on limited fixed incomes," but concluded that the USF would "ensure that telephone rates are within the means of the average subscriber in all areas of the country." Id. ¶ 30. Although the high-cost support program does not require recipients to use the additional interstate expense allocation to keep local rates lower than they otherwise would be, the FCC "believe[d] that the interest of state regulatory officials in keeping local rates affordable as well as the watchfulness of individual consumers and local consumer groups will ensure that this assistance is used for its intended purpose" – providing universally available telephone service at reasonable rates. Id. ¶ 33.

The FCC stated that "[b]y reducing the revenue requirement that a local company is entitled to claim for intrastate ratemaking purposes, [its] plan would help keep local rates lower than they otherwise would be." 1984 Order ¶ 22. In other words, the FCC structured the high-cost support payments to

---

[5]     Corporate operations expenses include general administrative expenses, including payroll, audits, legal fees, public relations, lobbying, human resources, etc., and executive and planning expenses. Loube Expert Report at 26; see also Wallman Depo. 69:7-11.

reduce the loop costs which local carriers must bear in high-cost areas, which it expected would reduce the amount of revenue intrastate ratemakers would permit the local carriers to generate from customers, which would in turn reduce local rates. <u>See</u> Loube Expert Report at 18; Wallman Depo. 41-43 (by shifting costs from local or state jurisdiction to federal jurisdiction, rate charged to local customer would be less than it otherwise would be). Altogether, the program created an incentive for carriers to extend service to high-cost areas.

### Facts

As already noted, the parties have stipulated to all material facts. The Court hereby incorporates the parties' stipulations. <u>Pretrial Order</u> (Doc. #37) at 2-14. The following is a summary of stipulated facts.

### Plaintiffs

Sprint Nextel is the common parent of an affiliated group of corporations (the "Sprint Nextel Consolidated Group") that filed a consolidated federal income tax return for each of the tax years ended December 31, 1988, and 1990 through 1994. Prior to 2005, Sprint Nextel was known as Sprint Corporation and prior to 1992, Sprint Corporation was known as United Telecommunications, Inc. Together with its subsidiaries, Sprint Nextel is engaged in the business of providing wireless and wireline communications products and services to consumers, businesses and government users in the United States and internationally.

Embarq and its related subsidiary companies comprise the local telecommunications business segment that, prior to 2006, was part of the Sprint Nextel Consolidated Group. In May of 2006, Embarq and related subsidiary companies spun off from the Sprint Nextel Consolidated Group. As part of the spin-off transaction, Sprint Nextel and Embarq executed a Tax Sharing Agreement that allocated tax

benefits and liabilities for pre-separation periods between the two companies. The Tax Sharing Agreement assigned to Embarq the financial interest in any tax refund resulting from the universal service fund issue at the center of this action.

## Plaintiffs' High-Cost Support Payments

Sprint Nextel and its predecessors have been receiving high-cost support payments since 1983. In 1990 through 1994, Sprint Nextel deposited its high-cost support payments into its general corporate bank accounts and did not segregate them from other funds in the accounts. During each of these years, Sprint Nextel spent more money on capital investments in its telecommunications infrastructure than it received in high-cost support payments, and issued common-stock dividends worth more than it received in high-cost support payments.[6]

## Plaintiffs' Tax Returns

In 1990 through 1994, the Sprint Nextel Consolidated Group received $176,143,385 in high-cost support payments from the USF.[7] It timely filed a consolidated federal income tax return for the tax years ending December 31, 1988, and 1990 through 1994 in which it treated high-cost support payments as taxable gross income. Prior to November 17, 2004, it paid a total of $966,413,999 in taxes for 1990 through 1994.[8] Sprint Nextel subsequently amended its federal income tax returns for 1990 through 2003 to treat the high-cost support payments as nontaxable contributions to capital under Section 118(a) and claiming tax refunds for those years.[9] Sprint Nextel filed refund claims in the amount of

[6]     See table attached as Exhibit A.

[7]     See table attached as Exhibit A.

[8]     See table attached as Exhibit A.

[9]     On its originally-filed federal income tax returns for each of the tax years ended
(continued...)

-12-

$31,844,199 for those years.[10]  Only the refunds for 1990 through 1994 are at issue here.  In accordance with I.R.C. § 362(c), Sprint Nextel concomitantly reduced its claims for depreciation deductions in its amended tax returns for 1990 through 1994.[11]

As a result of treating its high-cost support payments as nontaxable nonshareholder contributions to capital, Sprint Nextel's amended 1990 tax return reflected a carryback of an additional $17,851,212 net operating loss from the 1990 to the 1988 tax year.  This carryback did not yield a tax refund, but Sprint Nextel claimed additional alternative minimum tax credit amounts that the Sprint Nextel Consolidated Group could carry forward and use in future periods.

Sprint Nextel never filed an IRS Form 3115 (Application for Change in Accounting Method) with the IRS regarding its treatment of the high-cost support payments on its amended tax returns for 1990 through 1994.  Nor did it seek or receive the consent of the Secretary of Treasury, the IRS, or any of their delegates, in its decision to treat the high-cost support payments as contributions to capital under Section 118(a).  By letter dated June 20, 2007, the IRS formally denied Sprint Nextel's refund claims for the 1990 through 1994 tax years as well as the additional alternative minimum tax credit amount it claimed for the 1988 tax year.

The FCC did not require Sprint Nextel's applications for high-cost support from 1990 through

_____

[9](...continued)
December 31, 1983 through 2003, Sprint Nextel counted high-cost support it received from the USF as gross income.  By the time it decided to characterize the high-cost support payments as non-taxable contributions to capital under I.R.C. § 118, the statute of limitations had expired for its claims for taxable years 1983 through 1989.  Therefore, it did not file amended federal income tax returns re-characterizing any high-cost support payments for those years.

[10]      See table attached as Exhibit A.

[11]      Section 362 prevents a taxpayer from "double dipping" on nonshareholder contributions to capital – it prohibits a taxpayer from taking depreciation deductions on amounts it did not include in gross income.  See I.R.C. § 362(c)(2).

1994 to include any proposal for future expansion or improvement of its telecommunications network infrastructure. Nor did the FCC in any way order Sprint Nextel to expand its infrastructure as a condition of receiving the payments, or otherwise require it to spend the payments it received on particular products or services.

**Analysis**

Courts determine the "tax character" of a transaction by the "intent or motive of the transferor." CB&Q, 412 U.S. at 411. Here, the Court must examine the purpose of the USF and the intent of the FCC in creating the high-cost support program to determine the tax classification of high-cost support payments. The parties' arguments focus on four aspects of the high-cost support program: (1) its purpose and structure, (2) expenses considered in calculating the payments, (3) the public benefit of the program and (4) the five CB&Q factors. The Court will address each in turn.

## I. Purpose And Structure Of High-Cost Support Payments

The FCC designed the high-cost program to implement the universal service mandate – "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 (codified as amended in 47 U.S.C. § 151). To this end, the stated purpose of the program was to "moderate local exchange rates in high cost areas." 1984 Order ¶ 21. The FCC reiterated this purpose throughout the 1984 Order which created the program. 1984 Order ¶ 2 (additional interstate cost allocation meant "to help keep local rates affordable"); id. ¶ 3 n.5 ("additional lump sum interstate expense allocation" for high-cost study areas would "lower[] state revenue requirement[s] and keep[] intrastate rates lower than they otherwise would be"); id. ¶ 22 (FCC's "plan would help keep local rates lower than they otherwise would be"); id. ¶ 29

(USF provisions represent "sound balancing of concern for the promotion of universally available telephone service at reasonable rates"); id. ¶ 30 (high-cost program "will promote universal service by enabling telephone companies and state regulators to establish local exchange service rates in high cost areas that do not greatly exceed nationwide average levels").

Plaintiffs concede that the FCC intended the high-cost support program to keep local rates lower than they otherwise would be, but argue that lower rates were merely an indirect effect of providing direct <u>capital</u> subsidies aimed at promoting expansion of service.[12] Plaintiffs correctly note that the high-cost support mechanism achieves its goal of moderating local rates indirectly, but it does so by subsidizing <u>revenue</u> – not capital investment. This is evident in the mechanics of the high-cost support program.

The FCC designed the program to constrain local rates in high-cost areas by shifting a broad range of costs from local to interstate exchanges where average local loop costs exceed the national

---

[12] This, in essence, is plaintiffs' "carrier-focused" argument, which they repeat throughout their briefs. In essence, plaintiffs assert that because the high-cost support program is focused on reimbursing carrier costs, as opposed to customer costs, the payments should be treated as contributions to plaintiffs' capital, and not income. Plaintiffs further argue that this "carrier focus" stands in stark contrast to "consumer-focused" programs that directly subsidize revenue by taking the place of customer charges. Plaintiffs' "carrier-focused" argument, however, is too simplistic. The high-cost support program certainly focuses on carriers, but it focuses primarily on carriers' revenue and expenses – not their capital investments.

Plaintiffs also cite <u>In re Amendment Of Part 36 Of The Commission's Rules And Establishment Of A Joint Board</u>, 10 FCC Rcd. 12309, 12315 (July 13, 1995), to support their argument. It states that the FCC's "intention in providing high-cost assistance is to maximize connection to the nationwide telecommunications network, rather than to promulgate a system of general subsidies for local service rates." First, the FCC statement is not contemporaneous with the creation of the high-cost support program – it was issued 11 years after the 1984 Order. Second, it was issued after the tax years in question in this case – 1990-1994. Third, and perhaps most importantly, it does not undermine the Court's conclusion that the FCC used the high-cost support program to subsidize carriers' revenue, which would lower local rates and encourage broader service in high-cost areas. This view by no means construes the program to be "a system of general subsidies for local service rates." See id.

average by a benchmark percentage.  See 1984 Order ¶ 22.  As discussed in detail below, these expenses include among other things, general operating expenses and taxes.  47 C.F.R. § 36.621(a) (2009).  The FCC clearly anticipated that by assigning to interstate exchanges an additional share of loop expenses in high-cost areas, it would reduce the amount local carriers could recover through the ratemaking process, which would thereby reduce local rates for its customers.  1984 Order ¶ 22; see also Loube Expert Report at 18; Wallman Depo. 41-43.  In other words, the FCC intended the high-cost support program to subsidize local carriers' income, i.e. take the place of revenue the carrier would otherwise recoup from its customers.  See 1984 Order ¶ 22 ("By reducing the revenue requirement that a local company is entitled to claim for intrastate ratemaking purposes, the [FCC's] plan would help keep local rates lower than they otherwise would be.").

The high-cost support program is therefore similar to the railroad support payments in Texas & Pacific Railway.  There the Supreme Court held that railroad support payments, which the government used to ensure that certain railroads maintained a "minimum operating income," were not contributions to capital.  Tex. & Pac. Ry., 286 U.S. at 288-89.  Under that support program, if a qualified railroad's income fell below a fixed minimum, the government would make up the difference.  Id. at 289.  If, however, the railroad's income exceeded the minimum, it would have to pay the excess back to the government.  Id.  The Court noted that

> "[i]n the latter event, the carrier unquestionably would have been obligated to pay income tax measured by actual earnings; in the former, it ought not to be in a better position than if it has earned the specified minimum.  Clearly, then, the amount paid to bring the yield from operation up to the required minimum was as much income from operation as were the railroad's receipts from fares and charges.

Id.

The high-cost support program is similar, but instead of focusing on operating income it looks

-16-

at local carrier expenses. Nevertheless, the two programs are analogous. At bottom, <u>Texas & Pacific Railway</u> held that railroad support payments were taxable as income because they were essentially substitutes for revenue from railroad operations. Here, the high-cost support payments are likewise substitutes for operating revenue that carriers could otherwise seek to recover through the local ratemaking process. Plaintiffs' assertion that high-cost support payments are nontaxable contributions to capital defies the reasoning of <u>Texas & Pacific Railway</u>, which stated that plaintiffs should not "be in a better position" with respect to taxation of income for having received such payments. 286 U.S. at 289. Moreover, like the railroad support payments in <u>Texas & Pacific Railway</u>, high-cost support payments are not conditioned upon construction work (<u>i.e.</u> capital investment), but are measured by a variety of expenses including general operating costs.

## II. Calculation of High-Cost Support Payments

The Supreme Court decision in <u>Cuba Railroad Co.</u> highlights the distinction between gross income subsidies and contributions to capital. <u>Cuba Railroad Co</u> held that the Cuban government intended the payments in question to reimburse the railroad company for capital expenditures because the payments were proportionate to the number of miles of track the company had completed. 268 U.S. at 632. By contrast, the expenses used to calculate high-cost payments show that the link between high-cost payments and a carrier's capital expenditures is far more tenuous.

The FCC calculates high-cost support payments by a formula that adds a carrier's loop costs in a given study area, then divides the sum by the number of working loops the carrier operates in that area, which yields the carrier's average cost per working loop. This average cost is then compared to a benchmark national average cost per loop. If the carrier's average cost per loop exceeds the national average by a certain percentage, then the carrier may be entitled to a high-cost support payment equal

to a percentage of its costs that exceed the national average by a certain amount. This formula, though complicated, is important because the method of calculating the payments at issue informs whether the payments are contributions to capital. See Cuba R.R. Co., 268 U.S. at 632 (subsidy payments proportionate to mileage completed indicated purpose to reimburse railroad for capital expenditures); Tex. & Pac. R.R., 286 U.S. at 289 (payments taxable gross income where tied to income and not conditioned upon construction work performed).

Here, the loop costs at the heart of the high-cost support payment formula include (1) cost of capital, (2) depreciation attributable to loop facilities, (3) loop facility maintenance expenses and (4) corporate operations and other expenses and taxes. See 47 C.F.R. § 36.621(a) (1990). These expenses indicate that the FCC intended to link the high-cost support program to carriers' income rather than their capital expenditures. Plaintiffs correctly note that several of these costs are related to the cost of building and operating the network, but the breadth of expenses which the high-support payments cover belies plaintiffs' characterization of the payments as contributions to capital. Indeed, it "overtaxes imagination" to regard payments that cover general operating expenses – which include administrative, accounting, payroll, lobbying, human resources, legal and other expenses – as contributions to capital. See Detroit Edison Co., 319 U.S. at 102 ("overtaxes imagination" to regard payments by customers to extend service as contributions to capital).

Citing Texas & Pacific Railway, plaintiffs also correctly note that the high-cost support computation does not take into account prevailing consumer prices or local rates. They incorrectly conclude, however, that the payments therefore cannot be considered gross income. CB&Q expressly rejected this argument. It held that even though the assets in question were not payments from customers for services, "other characteristics of the transaction" led the Supreme Court "to the

conclusion that, despite this, the assets did not qualify as contributions to capital." 412 U.S. at 413-14. Here, one of the "other characteristics" is the formula for calculating high-cost payments, which includes general operating expenses, does not require recipients to spend the funds on capital projects and does not condition the payments upon construction work performed. By covering a portion of a carrier's general operating costs, the program subsidizes a carrier's gross income. By permitting a carrier to spend the funds on any expense whatever and by not conditioning the payments on construction work performed, the program does not closely link the payments to capital expenditures. Granted, subsidizing the cost of operating and maintaining existing loops creates an incentive to build new loops, but the FCC chose to do so indirectly by subsidizing a carrier's income from existing loops rather than the cost associated with building new loops. See United States v. Coastal Utils., Inc., 483 F. Supp.2d 1232, 1243 (S.D. Ga. 2007), aff'd 514 F.3d 1184 (11th Cir. 2008) (per curiam).

## III. Public Benefit

The parties agree that the FCC created the high-cost support program to provide a public benefit – affordable universal telecommunications service. They disagree, however, about its significance. Relying primarily on Brown Shoe, plaintiffs argue that because the FCC intended the payments to provide a public benefit (as opposed to a direct benefit to the FCC), the payments must be contributions to capital.[13] The government, relying on CB&Q and Texas & Pacific Railway, argues that intent to benefit the public is insufficient to make the payments contributions to capital. Courts certainly look to the end benefit of a payment in determining whether it should be characterized as gross income or

---

[13]        Plaintiffs also rely on a number of decisions by federal circuit courts of appeal, which reason that contributions to capital are characterized by indirect, speculative or intangible benefit to the transferor, in contrast to the direct benefit that inures to the transferor in a payment-for-services situation. See May Dep't Stores Co. v. Comm'r, 33 T.C.M. (CCH) 1128, 1130 (1974), aff'd 519 F.2d 1154 (8th Cir. 1975); Federated Dep't Stores, Inc. v. Comm'r, 426 F.2d 417, 421 (6th Cir. 1970).

a contribution to capital, <u>see, e.g.</u>, <u>Brown Shoe</u>, 339 U.S. at 591 (contribution to capital where donors "neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large"), but it does not necessarily control, <u>see, e.g.</u>, <u>CB&Q</u>, 412 U.S. at 413-14 (government donation to railroad for public benefit – railroad safety and traffic flow – not contribution to capital).

In <u>Brown Shoe</u>, the nature of the payments permitted the Court to "infer a different purpose in the transactions between petitioner and the community groups" – <u>i.e.</u> that the transferors intended the payments to be contributions to capital, not income. As discussed above, unlike in <u>Brown Shoe</u>, the other characteristics of the high-cost support program – its structure and the formula for calculating payments – lead the Court to conclude that the FCC did not intend the payments to be contributions to capital.

## IV. CB&Q Factors

In <u>CB&Q</u>, the Supreme Court enunciated a non-exhaustive list of five characteristics of contributions to capital, which it distilled from <u>Detroit Edison</u> and <u>Brown Shoe</u>: (1) the receipt "must become a permanent part of the transferee's working capital structure;" (2) it "may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee;" (3) it "must be bargained for;" (4) it "must result in benefit to the transferee in an amount commensurate with its value;" and (5) it "ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect." <u>CB&Q</u>, 412 U.S. at 413. The parties agree that the <u>CB&Q</u> factors are of questionable value in this context,[14] but they nevertheless

---

[14]     <u>CB&Q</u> involved contributions of hard assets (<u>e.g.</u>, signals, signs, floodlights, railroad crossings, etc.), whereas this case involves cash payments.

rely on the factors to support their respective positions. Plaintiffs assert that high-cost support payments meet all five factors, while the government argues that the payments meet none of them.

### A. Permanent Part Of Working Capital Structure

Plaintiffs argue that high-cost support payments become a permanent part of a local carrier's working capital structure because the payments cover costs associated with building and operating its network. As noted above, however, the FCC did not condition high-cost support payments on capital expenditures. Cash subsidies such as these do not necessarily form a permanent part of a transferee's working capital structure. Here, plaintiffs could have properly spent the money on dividends, taxes or general operating expenses unrelated to capital projects. The high-cost support payments therefore do not satisfy the first CB&Q factor – that the payments "must become a permanent part of the transferee's working capital structure." Id. at 413 (emphasis added).

### B. Not Compensation For Specific, Quantifiable Service Provided By Transferor For Transferee

As noted above, the parties agree that the FCC intended the high-cost support program to provide a public benefit – i.e. not a benefit to the government. The government nevertheless argues that high-cost support payments compensated plaintiffs for services rendered – providing telephone service to subscribers. The second CB&Q factor, however, is specifically limited to payments for services provided "for the transferor by the transferee." Id. (emphasis added). Here, even accepting the government's argument, plaintiffs performed the service for its customers – not for the government. The high-cost support payments therefore satisfy the second CB&Q factor – the payments were not compensations for services rendered.

### C.    Bargained For

The "bargained for" factor seems inapplicable to this case.  Traditionally, a "bargained-for exchange" refers to a requirement of contract formation.  Here, however, there is no contract between the parties; rather, plaintiffs are mere third-party beneficiaries of a regulatory decision.  Granted, plaintiffs lobbied the FCC with respect to the high-cost support program and participated in the public notice-and-comment process; in a traditional sense, however, they did not bargain for the high-cost support payments.  Instead of trying to divine whether lobbying constitutes bargaining under CB&Q, the Court does not rely on this factor as it appears it is inapt.

### D.    Benefit To Transferee In Amount Commensurate With Value

The government asserts that because plaintiffs could have spent the high-cost payments on dividends, the payments would not necessarily benefit the corporation itself.  This argument is without merit.  Because the high-cost payments are cash payments, by definition they benefitted plaintiffs in an amount commensurate with their value.

### E.    Contribute To Production Of Additional Income

Although plaintiffs could have employed their high-cost support payments to produce additional income, nothing in the high-cost support program requires or ensures that the payments will be put to such use.  As mentioned above, plaintiffs were free to use the payments for anything they wanted, including taxes or salaries.  The high-cost support payments here, in contrast to the railroad track in Cuba Railroad Co. or the investment in manufacturing facilities in Brown Shoe, would not by themselves "materially contribute to the production of further income."  CB&Q, 412 at 414.

In sum, the CB&Q factors send mixed signals in this case – they do not dictate a particular result, nor do they undermine the Court's conclusion above that the high-cost support payments are not

contributions to capital.[15] Here, the structure of the high-cost support program and the costs considered in calculating the payments, indicate that the FCC intended the payments to be taxable supplements to gross income and not nontaxable nonshareholder contributions to capital. The Court therefore concludes that the high-cost support payments which plaintiffs received do not satisfy the narrow exclusion in Section 118 for contributions to capital.[16]

**IT IS THEREFORE ORDERED** that United States' Motion For Summary Judgment (Doc. #40) filed December 7, 2010 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion For Summary Judgment (Doc. #38) filed December 7, 2010 be and hereby is **OVERRULED**.

Dated this 4th day of March, 2011 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[15] The government argues that plaintiffs must show that the high-cost support payments satisfy all five CB&Q factors to prevail. This argument is primarily based on Fifth Circuit case law. See Brief In Opposition To Plaintiffs' Motion For Summary Judgment (Doc. #42) at 18 & n.48. The Fifth Circuit has adopted a rule that to be considered a contribution to capital, a contribution must strictly conform to the first four CB&Q factors, and ordinarily the fifth as well. See Deason v. Comm'r, 590 F.2d 1377, 1379 (5th Cir. 1979); AT&T, Inc. v. United States, No. 09-50651, 2011 WL 9729, at *5 (Jan. 4, 2011). The Tenth Circuit has not adopted such a rule, and in a post-CB&Q nonshareholder contribution to capital case did not even cite CB&Q. See Hayutin, 508 F.2d at 479-82. The Court therefore declines to adopt such a rule. It is sufficient to note that plaintiffs have not established that the high-cost support payments satisfy each of the CB&Q factors and that the other aspects of the program, mentioned above, lead the Court to conclude that the high-cost support payments which plaintiffs received were not contributions to capital.

[16] The Court therefore does not consider the government's change of accounting method affirmative defense. In addition, this conclusion is consistent with the only two circuit courts to consider this question. See AT&T, Inc., 2011 WL 9729; Coastal Utils., 514 F.3d 1184 (per curiam) (summarily affirming district court's "thorough and well-reasoned order," see 483 F. Supp.2d 1232).

-23-

**APPENDIX A***

| YEAR | HIGH-COST SUPPORT PAYMENTS TO SPRINT NEXTEL CONSOLIDATED GROUP | CAPITAL INVESTMENT IN LOCAL TELECOM NETWORK INFRASTRUCTURE** | DIVIDENDS** | SPRINT NEXTEL TAX PAYMENTS | REFUND SOUGHT | REDUCTION IN DEPRECIATION DEDUCTIONS |
|---|---|---|---|---|---|---|
| 1990 | $19,005,732 | $551,900,000 | *** | $99,637,129 | $2,796,419 | $1,132,300 |
| 1991 | $25,513,901 | $504,500,000 | $291,000,000 | $115,715,806 | $5,579,581 | $3,614,807 |
| 1992 | $38,752,693 | $670,100,000 | $296,000,000 | $173,641,092 | $7,282,113 | $6,878,005 |
| 1993 | $46,599,882 | $712,700,000 | $324,000,000 | $244,871,094 | $8,240,601 | $10,695,764 |
| 1994 | $46,271,177 | $754,800,000 | $346,000,000 | $332,548,878 | $7,945,485 | $14,869,245 |
| TOTAL | $176,143,385 | $3,194,000,000 | $1,257,000,000 | $966,413,999 | $31,844,199 | $37,190,121 |

\* Amounts taken from Pretrial Order (Doc. #37).
\*\* Amounts approximate.
\*\*\* Amount not included in stipulation, though parties stipulate that "[f]or each year from 1990 through 1994, Sprint Nextel spent more money in common-stock dividends than it received in High-Cost Support payments." Pretrial Order (Doc. #37) ¶ 58.